IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

_____

**STEFANI MCMICHAEL-GOMBAR,**
*Petitioner/Appellant,*


*v.*


**PHOENIX CIVIL SERVICE BOARD, ET AL.,**
*Respondents/Appellees,*

**CITY OF PHOENIX,**
*Real Party in Interest/Appellee.*

_____

No.   CV-22-0176-PR
**Filed December 5, 2023**

_____

Appeal from the Superior Court in Maricopa County
The Honorable Timothy J. Thomason, Judge
No.   LC2020-000308-001
**AFFIRMED**

_____

Opinion of the Court of Appeals, Division One
253 Ariz. 429 (App. 2022)
**VACATED**

_____


COUNSEL:

Steven J. Serbalik (argued), Steven J. Serbalik, PLC, Scottsdale, Attorney for
Stefani McMichael-Gombar

Richard K. Mahrle, Gammage & Burnham P.L.C., Phoenix, Attorneys for
the City of Phoenix Civil Service Board

Diane M. Johnsen, Alexis E. Danneman (argued), Perkins Coie LLP,
Phoenix, Attorneys for The City of Phoenix

_____

VICE CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL and JUSTICES BOLICK, LOPEZ, BEENE, MONTGOMERY, and KING joined.

_____

VICE CHIEF JUSTICE TIMMER, Opinion of the Court:

**¶1**        The City of Phoenix (the "City") briefly suspended Phoenix Police Sergeant Stefani McMichael-Gombar for posting content to her Facebook page that violated the Phoenix Police Department's Social Media Policy (the "Policy"). On appeal, the Phoenix Civil Service Board (the "Board") upheld the suspension. The issues here are whether the Board needed to consider McMichael-Gombar's arguments that discipline was either unwarranted or excessive because (1) the Policy is overbroad and violates the First Amendment to the United States Constitution, or (2) she reasonably believed she had a First Amendment right to make the Facebook post. We conclude the Board lacked authority to decide whether the Policy is unconstitutional, either facially or as applied. But McMichael-Gombar was entitled to argue and introduce supporting evidence that she believed she acted within her First Amendment rights.

## BACKGROUND

**¶2**        After receiving notice of her suspension, McMichael-Gombar timely appealed to the Board, giving the following explanation in her written appeal: "I did make the [F]acebook post alleged. I believe the [P]olicy is overbroad and unconstitutional, and that the discipline is excessive and not supported by just [cause]—particularly because my Facebook was set to private." Before McMichael-Gombar's hearing, the City asked the assigned hearing officer to preclude her from introducing evidence or presenting arguments "regarding the constitutionality of the Police Department's Social Media policy." The hearing officer granted the City's request, and according to McMichael-Gombar, she was "not allowed to elicit testimony nor present evidence related to how the [Policy] was unconstitutional nor how it impacted her ability to participate in her private affairs and express her First Amendment rights." The hearing officer

ultimately recommended that the Board uphold McMichael-Gombar's suspension.

**¶3** The Board reviewed the hearing officer's recommendation during a subsequently held meeting. On the advice of its counsel, the Board, like the hearing officer, declined to consider whether the Policy violated McMichael-Gombar's First Amendment rights. According to McMichael-Gombar, she was therefore "barred from advancing evidence or arguments related to how [the Policy] was over broad [sic] and unconstitutional—both on its face and as-applied." The Board then upheld the suspension.

**¶4** McMichael-Gombar next sought special action relief in the superior court. For the first time, she argued that the Board's refusal to consider the constitutionality of the Policy violated "merit principle[s]" underlying the City's personnel system, as stated in the Phoenix City Charter (the "Charter"). She asked the court to remand the matter to the Board for a new hearing "with instructions to permit testimony and evidence relating to the constitutionality of the Policy."

**¶5** The superior court declined special action jurisdiction and dismissed the complaint. It reasoned that the Charter neither requires the Board to consider the constitutionality of the City's policies nor authorizes it to do so. The court found that the Board is only required to "determin[e] if the City has proven that the allegations against an employee in a disciplinary notice are true, and if so, whether an appropriate level of discipline was administered."

**¶6** The court of appeals vacated the superior court's ruling and remanded the matter for the Board to consider McMichael-Gombar's evidence and arguments. *McMichael-Gombar v. Phx. Civ. Serv. Bd.*, 253 Ariz. 429, 437 ¶¶ 32–33 (App. 2022). The court determined that the Board did not have to decide whether the Policy was unconstitutional, either facially or as applied. *Id.* at 436–37 ¶ 31. But the court concluded the Board must "determine whether the sanction gives 'proper regard' to McMichael-Gombar's constitutional rights." *Id.* at 436. The court did not explain what the Board must do to give "proper regard" to those rights. *See id.*

**¶7** We granted review of the Board and the City's petitions for review to determine the extent of the Board's authority to decide or

consider constitutional issues in disciplinary matters, an issue of statewide importance. Although McMichael-Gombar has retired from the Phoenix Police Department, the matter is not moot because reversing the suspension decision could affect her financially. We have jurisdiction over this matter pursuant to article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

**¶8** We will affirm the Board's decision unless it is "arbitrary, capricious or involved an abuse of discretion." *Woerth v. City of Flagstaff*, 167 Ariz. 412, 417 (App. 1990) (quoting *City of Tucson v. Mills*, 114 Ariz. 107, 111 (App. 1976)). A legal error, like the Board misinterpreting its powers and duties under the Charter, may constitute an abuse of discretion. *See Shinn v. Ariz. Bd. of Exec. Clemency*, 254 Ariz. 255, 259 ¶ 13 (2022).

### A. The Charter Defines The Board's Powers And Duties.

**¶9** The City organized its government under the Charter, which the City's electorate enacted pursuant to the Arizona Constitution's "home rule charter" provision. *See* Ariz. Const. art. 13, § 2 (authorizing cities with populations greater than 3,500 to "frame a charter for its own government consistent with, and subject to, the Constitution and the laws of the state"); Phx. City Charter, Preamble. Within those boundaries, the Charter effectively acts as the City's "local constitution." *Piccioli v. City of Phx.*, 249 Ariz. 113, 118 ¶ 15 (2020) (quoting *State ex rel. Brnovich v. City of Tucson*, 242 Ariz. 588, 598 ¶ 39 (2017)). But unlike a constitution, which is "a limitation of power," a city charter grants power. *Paddock v. Brisbois*, 35 Ariz. 214, 220 (1929).

**¶10** The Charter established a personnel system for classified employees, created the Board, and divided responsibilities for the system among the City Council, the City Manager (acting as the "Personnel Official"), and the Board. *See* Phx. City Charter, ch. 25, §§ 3, 6–7. The Board consists of five volunteer "residents, citizens and electors of the City," who are appointed by the City Council and serve staggered three-year terms. *See id.* § 2.

**¶11** Among other powers and duties, the Charter tasks the Board with hearing appeals of disciplinary suspensions from classified employees, including police officers like McMichael-Gombar. *See id.* § 3(3). To fulfill this duty, the Board may adopt procedural rules, hold

hearings, and authorize hearing officers to conduct those hearings.  *Id.*
§ 3(1), (3).  When addressing discipline imposed on police officers, the
Board is also bound by the "peace officers bill of rights" ("POBR"), which
provides minimum rights for all peace officers in Arizona.  *See* A.R.S.
§§ 38-1101 to -1120.  The Board makes the final, binding disciplinary
decision, and no further appeals are permitted.  *See* Phx. City Charter, ch.
25, § 3(3).

¶12        As an administrative body, the Board holds "no common law
or inherent powers."  *See Kendall v. Malcolm*, 98 Ariz. 329, 334 (1965).  The
Charter, as the authority creating the Board, restricts the Board's powers
and duties to those explicitly described in the document or in personnel
rules approved by the City Council.  *See id.*; *see also City of Phx. v. Phx. Civ.
Serv. Bd.*, 169 Ariz. 256, 259 (App. 1991) (concluding that the Board's powers
and duties are "strictly limited" by the Charter); Phx. City Charter, ch. 25,
§ 8(2)(f) (requiring the City Council to adopt personnel rules governing
disciplinary actions).  The Board can also exercise powers necessarily
implied to effectuate powers expressly granted.  *See City of Flagstaff v.
Associated Dairy Prods. Co.*, 75 Ariz. 254, 257 (1953) ("Implied powers do not
exist independently of the grant of express powers and the only function of
an implied power is to aid in carrying into effect a power expressly
granted." (quoting *Associated Dairy Prods. Co. v. Page*, 68 Ariz. 393, 395
(1949))).  Thus, whether the Board has the power or duty to overturn or
modify a disciplinary decision—either because it concludes that the
personnel policy underlying it is unconstitutional or that the disciplined
employee reasonably believed it so—depends on the scope of authority
granted to the Board by the Charter, the personnel rules, and the POBR.

### B. The Board's Powers And Duties Do Not Include Deciding The Constitutionality Of Personnel Policies.

¶13        We review the Charter's meaning de novo as a legal issue.
*See Piccioli*, 249 Ariz. at 118 ¶ 15.  In doing so, we "examine the [Charter]
as a whole along with related provisions in the Charter."  *Id.*  If a
provision is "subject to only one reasonable interpretation, we apply it
without further analysis."  *See id.* (quoting *Glazer v. State*, 237 Ariz. 160, 163
¶ 12 (2015)).  But "[i]f more than one reasonable interpretation exists, we
will consider secondary principles, including the purpose . . . and the
effects and consequences of different interpretations, to identify the correct
one."  *Id.*

**¶14** McMichael-Gombar first argues that chapter 25, § 1(2)(e) of the Charter required the Board to consider whether the Policy violates the First Amendment. She does not assert that the Board could declare the Policy unconstitutional and bind the City and others to that determination. Rather, she contends § 1(2)(e) required the Board to consider evidence and arguments that the Policy is unconstitutional in deciding whether she was appropriately disciplined.

**¶15** Section 1(2)(e) provides in relevant part:

> **Sec. 1.   Purpose and policy.**
>
> 2.   The City has determined the necessity of establishing a merit system of personnel administration based on merit principles and professional methods governing the appointment, tenure, promotion, transfer, layoff, separation, discipline, and other incidents of employment relating to City employees. These merit principles include:
>
> . . . .
>
> e.   Assuring impartial treatment of applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, national origin, sex, religious creed or handicap, *and with proper regard for their privacy and constitutional rights as citizens.*

Phx. City Charter, ch. 25., § 1(2)(e) (emphasis added). McMichael-Gombar seizes on the above-italicized language to support her contention that the Board must consider whether the Policy violates the First Amendment, either facially or as applied, and, if so, rescind or modify her discipline.

**¶16** We disagree that § 1(2)(e)'s statement of merit principles creates powers or duties for the Board. By its plain language, that provision broadly states principles underlying the creation and governance of the entire personnel system and does not create powers or duties for anyone administering that system—the City Manager, the City Council, or the Board. *See id.* § 1(2). Other Charter provisions explicitly provide those powers and duties. *See id.* §§ 3, 6–7 (creating powers and duties, respectively, for the Board, the City Manager, and the City Council). Indeed, § 1 is titled "Purpose and policy" and nowhere mentions the Board.

Conversely, § 3 is titled "Powers and duties of the Board," leaving no doubt which provision addresses the Board's authority.

**¶17** Also, the Charter provides that the Board is only authorized to exercise authority "specifically reserved" to it in § 3. *See id.* § 6(1) (granting authority to the City Manager as "the City's Personnel Official" to "[a]dminister all the provisions of this chapter and of the personnel rules not specifically reserved to the [Board] pursuant to Sec. 3 herein or to the City Council pursuant to Sec. 7 herein"). Thus, we cannot interpret § 1(2)(e) as empowering the Board to perform any function—including deciding whether City policies are unconstitutional—because § 6(1) limits the Board's powers and duties to those specifically reserved to it in § 3.

**¶18** If the Board is empowered to decide whether the Policy is unconstitutional, that authority must be found in § 3. That section provides:

> **Sec. 3.   Powers and duties of the Board.**
>
> The Board shall:
>
> 1.   Adopt such rules and hold such hearings as it finds necessary in order to perform the duties and responsibilities vested in it by this chapter.
>
> 2.   Submit periodic advisory reports to the Council regarding the activities of the Board as they relate to the application of merit principles in City personnel management.
>
> 3.   Notwithstanding the provisions of Chapter III, Section 2B(1) of this Charter the Board shall hear appeals from disciplinary demotions, discharges, and suspensions by classified employees who have completed the prescribed probationary period. The Board may delegate to hearing officers the authority to conduct hearings. The decisions of the Board shall be final and binding.
>
> 4.   Administer oaths, compel attendance of and examine witnesses and compel production of and examine documents.

7

> 5.     Hear appeals from classified employees from interpretations of the personnel rules approved by the Council.
>
> 6.     Propose personnel rules and amendments thereto.

*Id.* § 3.   Nothing in this provision suggests that the Board's appellate authority requires or empowers it to decide the constitutionality of the City's policies.   Notably, although the Charter explicitly delineates the Board's powers in carrying out its duties—for example, holding hearings, administering oaths, interpreting personnel rules, and examining witnesses and documents—nowhere does it permit the Board to decide the constitutionality of policies, rules, or regulations.   *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012) ("Nothing is to be added to what the text states or reasonably implies . . . . That is, a matter not covered is to be treated as not covered.").   And because the Board does not possess any inherent powers, it is limited to the powers "granted specifically" in § 3.   *See Kendall*, 98 Ariz. at 334.   Thus, the Board is not empowered to decide whether a personnel policy is unconstitutional.

¶19         We disagree with the court of appeals that § 3(2) specifically reserves to the Board the power to apply § 1(2)(e)'s merit principle in a disciplinary appeal.   *See McMichael-Gombar*, 253 Ariz. at 435 ¶ 24.   Section 3(2) requires the Board to periodically report its activities to the City Council "as they relate to the application of merit principles in City personnel management."   But that section "does not [itself] add or expand the activities in which the Board is otherwise authorized to engage."   *City of Phoenix*, 169 Ariz. at 260.   And the Board can fulfill this duty without deciding the constitutionality of the City's policies.   For example, the Board could propose new or amended personnel rules that promote impartial treatment of employees and report those efforts to the City Council.   Or it could report rescinding an employee's discipline because similarly situated employees received no discipline for the same infraction.

¶20         The personnel rules approved by the City that govern disciplinary appeals also do not authorize the Board to decide whether a city policy is unconstitutional.   Phoenix Interim Personnel Rule 22e(3)(B) confines the substance of an appeal to challenging whether (1) the employee committed an alleged violation, and/or (2) the discipline imposed was too

severe. No rule authorizes an appeal on the basis that a city policy is "overbroad and unconstitutional," as McMichael-Gombar alleged as one basis for her appeal. Consistently, the rules require the hearing officer to summarize *factual* findings in the final report and recommendation to the Board but do not require any legal conclusions. *See* Phoenix Interim Personnel Rule 22g(3)(L). And the Board must decide whether to uphold, modify, or reject the hearing officer's recommendation based on the parties' arguments, including those addressing alleged *factual* errors in the report, and any additional evidence permitted. *See id.* Rule 22i(5), (8). No rule authorizes the Board to decide whether a city policy is unconstitutional.

**¶21** This interpretation of the Board's authority under § 3 and the personnel rules is consistent with the POBR. Although A.R.S. § 38-1106 provides requirements for disciplinary appeals before decision-makers like the Board, nothing requires the decision-maker to decide the constitutionality of a policy, rule, regulation, ordinance, or law underlying a disciplinary decision. On the other hand, the decision-maker must "state in every finding of disciplinary action whether or not just cause existed for the disciplinary action." § 38-1106(L). "Just cause" means:

> (a) The employer informed the law enforcement officer of the possible disciplinary action resulting from the officer's conduct through agency manuals, employee handbooks, the employer's rules and regulations or other communications to the officer or the conduct was such that the officer should have reasonably known disciplinary action could occur.

> (b) The disciplinary action is reasonably related to the standards of conduct for a professional law enforcement officer, the mission of the agency, the orderly, efficient or safe operation of the agency or the officer's fitness for duty.

> (c) The discipline is supported by a preponderance of evidence that the conduct occurred.

> (d) The discipline is not excessive and is reasonably related to the seriousness of the offense and the officer's service record.

§ 38-1101(7). Significantly, "just cause" does not depend on the constitutionality or lawfulness of any policy or rule violated by the officer. *See id.*

**¶22** McMichael-Gombar correctly points out that claimants routinely raise constitutional arguments in administrative proceedings. We reiterated in *Mills v. Arizona Board of Technical Registration*, 253 Ariz. 415, 422 ¶ 19 (2022), that agencies "may apply constitutional doctrines when resolving claims." An agency, however, can only apply those doctrines to issues it is authorized to resolve. *See Kendall*, 98 Ariz. at 334; *see also Moulton v. Napolitano*, 205 Ariz. 506, 513 ¶ 20 (App. 2003) (finding that the revenue department had authority to apply constitutional doctrines in deciding whether a taxpayer received the proper tax credit because the legislature authorized it to consider "any legal theory, including a constitutional one"). Here, for example, because the Charter requires the Board to interpret personnel rules in an employee's appeal, *see* Phx. City Charter, ch. 25., § 3(5), it may apply the First Amendment in discarding an interpretation that would violate an employee's rights when resolving that appeal. But as we have explained, neither the Charter, the rules governing disciplinary proceedings, nor the POBR authorizes the Board to decide whether a city policy underlying discipline is unconstitutional.

**¶23** Significantly, we also stated in *Mills* that only courts may declare laws and rules unconstitutional, either facially or as applied, and enjoin their application. 253 Ariz. at 422–23 ¶ 20. Here, McMichael-Gombar sought to introduce evidence and argue that the Policy is overbroad and unconstitutional under the First Amendment. Although she did not seek a binding declaration, her request for relief from discipline on that basis effectively asked the Board to decide the constitutionality of the Policy and enjoin its application. And because the Board's decision is final and non-appealable, *see* Phx. City Charter, ch. 25., § 3(3), if the Board decided the issue, the courts would have no opportunity to review that decision. The Board would have usurped the courts' constitutionally granted authority to decide the Policy's constitutionality. *See Mills*, 253 Ariz. at 422–23 ¶ 20; *see also Moulton*, 205 Ariz. at 513 ¶ 20 ("Only the courts have authority to take action that runs counter to the expressed will of the legislative body." (quoting *Estate of Bohn v. Waddell*, 174 Ariz. 239, 249 (App. 1992)) (cleaned up)). Our narrower interpretation of the Board's authority avoids this infringement on judicial authority. *See State v. Brearcliffe*, 254 Ariz. 579, 585 ¶ 22 (2023) (stating that when interpreting statutes and rules the courts "avoid interpretations that unnecessarily

implicate constitutional concerns" (quoting *Scheehle v. Justices of the Sup. Ct.*, 211 Ariz. 282, 288 ¶ 16 (2005))).

**¶24** McMichael-Gombar secondarily argues the Board erroneously precluded her from arguing that her suspension was either unwarranted or excessive because she reasonably believed she had a First Amendment right to make the Facebook post. We agree that McMichael-Gombar was entitled to make this argument and introduce supporting evidence. The Board essentially serves as the community's conscience and is charged with deciding whether the employer had cause to discipline the employee and whether the discipline imposed was unwarranted or too severe. *See* Phx. City Charter, ch. 25, § 3(3); Phoenix Interim Personnel Rule 22e(3)(B). It can apply popular values and common sense in deciding whether an employee was fairly disciplined. Thus, as the City conceded at oral argument, the Board could have considered whether McMichael-Gombar reasonably believed her speech was constitutionally protected. It also could have considered whether her posting violation was excusable because similarly situated employees were treated differently; whether discipline was fairly imposed in light of her Facebook privacy setting; and whether other relevant facts cast doubt on the appropriateness of the disciplinary decision. Some of these factors may overlap with the Charter's merit principles, which we have said do not impose any powers or duties on the Board. *See* Part B ¶ 16. Regardless, the Board was authorized by § 3(3) to consider such factors in determining whether suspending McMichael-Gombar was an excessive disciplinary sanction.

**¶25** As the party seeking special action relief, McMichael-Gombar had the burden to provide a record supporting her claims. *See* Ariz. R.P. Spec. Act. 4(d). The sparse record here, however, does not show that the Board prevented McMichael-Gombar from arguing or presenting evidence that she believed she had a First Amendment right to make the Facebook post. The record does not contain the Policy or the contents of the post; it does not reflect the evidence or arguments she successfully presented to the hearing officer or the Board; and it does not describe with any detail the evidence she was precluded from introducing. The record reflects only that the hearing officer and the Board precluded her from arguing or introducing evidence that the Policy itself was overbroad and therefore violated the First Amendment.

¶26 Our decision does not leave classified employees like McMichael-Gombar without a remedy to challenge the constitutionality of personnel policies and rules. Just like unclassified employees who lack appeal rights before the Board, *see* Phx. City Charter, ch. 25, §§ 3(3), 5, classified employees have access to the courts to vindicate their constitutional rights. For example, classified employees could file a complaint with the state or federal courts pursuant to 42 U.S.C. § 1983, challenging the Policy as depriving them of rights secured by the First Amendment. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (explaining that § 1983 aims "to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails"). Indeed, other Phoenix police officers filed such an action in the federal district court, claiming that parts of the Policy are facially invalid under the First Amendment and seeking to enjoin the imposition of discipline for the officers' violations. *See Hernandez v. City of Phx.*, 43 F.4th 966, 975 (9th Cir. 2022). Officers could also file a complaint with the superior court seeking declaratory and injunctive relief, as occurred in *Mills*. 253 Ariz. at 419 ¶ 7.

¶27 In sum, we agree with the superior court that the Board did not fail to exercise or abuse the discretion it had a duty to exercise. *See* Ariz. R.P. Spec. Act. 3 (providing the operative questions for a special action complaint). Neither the Charter, the personnel rules, nor the POBR authorized the Board to decide whether the Policy violated the First Amendment, either facially or as applied. Although McMichael-Gombar could have presented evidence or argued that she believed she had a First Amendment right to make her Facebook post, she did not satisfy her burden to show that the Board precluded her from doing so. For these reasons, the superior court correctly dismissed her special action complaint.

## CONCLUSION

¶28 We vacate the court of appeals' opinion and affirm the superior court's order dismissing McMichael-Gombar's special action complaint.

12