**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JP MORGAN CHASE BANK
ACCOUNT NUMBER ENDING
8215 IN THE NAME OF LADISLAO
V. SAMANIEGO, VL:
$446,377.36; JP MORGAN
CHASE BANK ACCOUNT
NUMBER ENDING 7058 IN THE
NAME OF MANUEL CASTRO, VL:
$361, 070.25,
*Defendants*,

LADISLAO V. SAMANIEGO;
MANUEL CASTRO,
*Claimants-Appellants*.

No. 14-16070

D.C. No.
2:12-cv-00155-MHB

OPINION

Appeal from the United States District Court
for the District of Arizona
Michelle H. Burns, Magistrate Judge, Presiding

Argued and Submitted May 4, 2016
Pasadena, California

Filed September 1, 2016

Before: RAYMOND C. FISHER, MILAN D. SMITH, JR.,
and JACQUELINE H. NGUYEN, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Civil Forfeiture

The panel reversed the district court's summary judgment in favor of the government in claimants' challenge to the government's seizure of two J.P. Morgan Chase bank accounts in a civil asset-forfeiture action, and remanded for further proceedings.

Claimants Ladislao Samaniego and Manuel Castro opened the two bank accounts which the government seized, based on the government's belief that the accounts were used in money laundering connected to the illegal drug trade. The district court held that claimants had not demonstrated a property interest in the seized funds sufficient to confer standing.

The panel held that claimants had standing to proceed past summary judgment and challenge the government's forfeiture action, but did not address the merits of their claims or preclude the district court from re-examining Article III standing at a later date, in light of additional evidence.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that claimants set forth sufficient evidence for a reasonable factfinder to conclude that they had Article III standing to challenge the forfeiture. The panel held that in light of claimants' self-contradictory claims and shifting legal theories, the district court did not err by holding that claimants failed to provide indicia of their own ownership of the funds sufficient to defeat summary judgment, but claimants demonstrated a possessory interest in the funds sufficient to defeat summary judgment. Specifically, the panel held that, viewing the evidence in the light most favorable to claimants, claimants' explanation of their respective possessory interests in the seized funds, coupled with supporting evidence in the form of declarations, deposition testimony, bank records, and other evidence, raised a material dispute of fact for trial.

The panel also held that claimants provided sufficient evidence of possessory interests to confer prudential standing.

## COUNSEL

Taylor Clarke Young (argued) and Robert A. Mandel, Mandel Young PLC, Phoenix, Arizona, for Claimants-Appellants.

Monica N. Edelstein (argued), Assistant United States Attorney; Mark S. Kokanovich, Deputy Appellate Chief; John S. Leonardo, United States Attorney; United States Attorney's Office, Phoenix, Arizona; for Plaintiff-Appellee.

**OPINION**

M. SMITH, Circuit Judge:

Ladislao Samaniego and Manuel Castro (collectively, Claimants) challenge the government's seizure of two J.P. Morgan Chase bank accounts in a civil asset-forfeiture action. One account, totaling $446,377.36, was held in the name of Samaniego; the other, totaling $361,070.25, in the name of Castro. In a verified complaint seeking forfeiture, the government contends that Claimants unlawfully used the accounts to launder money connected with illicit drug proceeds.

Claimants answered and filed verified claims in response to the complaint, alleging that they held ownership and possessory interests in the seized funds sufficient to confer standing. The parties filed cross-motions for summary judgment.[1] The district court entered judgment in favor of the government, holding that Claimants failed to produce adequate evidence of their Article III and prudential standing to contest the forfeiture. We reverse.

**STANDARD OF REVIEW AND JURISDICTION**

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review summary judgment determinations de novo. *Wright v.*

---

[1] The government captioned its motion as a "motion to strike" Claimants' answer and verified claims for lack of standing. However, it presented the motion as the equivalent of a motion for summary judgment. *See* Fed. R. Civ. P. G(8)(c)(ii)(B). On appeal, we review the district court's decision as a grant of "summary judgment" and refer to it as such in our opinion.

*Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1133 (9th Cir. 2011). Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

Because this appeal concerns a civil forfeiture matter, summary judgment procedures are construed "in light of the statutory law of forfeitures, and particularly the procedural requirements set forth therein." *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 979 (9th Cir. 2002). Forfeiture proceedings are governed by statute and by the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure. *See* 18 U.S.C. § 983(a)(4)(A). The relevant rules provide that the government may move to strike a claim or answer for lack of standing. Fed. R. Civ. P. G(8)(c)(i)(B). Such a motion "may be presented as . . . a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." *Id.* G(8)(c)(ii)(B).

## FACTS AND PRIOR PROCEEDINGS

Ladislao Samaniego is the general manager and minority shareholder of a Mexican currency-exchange business called Centro Cambiario Sonorense, formerly Casa de Servicios de California (CSC). Samaniego and his longtime acquaintance Manuel Castro, both residents of Mexico, opened the two

bank accounts that are the subject of this action as a result of CSC's business relationship with a company called Fruteria Welton.

Fruteria Welton is a Mexican grocery company with stores along the U.S.-Mexican border. In the course of its daily operations, Fruteria Welton acquires large amounts of Mexican and U.S. currency. Fruteria Welton, along with a related company Distribuidora Welton (collectively, Welton), is owned in part by Jorge Salas Alvarez. Welton enlisted the services of CSC to count, record, and deposit the currency that it acquired.

Samaniego considers Salas Alvarez his *compadre*, a term used to denote a close friend who holds the near-familial status of a godfather.[2] Through an agreement with Salas Alvarez that has lasted seventeen years, CSC (and by extension, Samaniego) was permitted to use the currency it collected for its own purposes, as long as Welton did not require immediate use of the funds. CSC and Samaniego were also entitled to retain any profits arising from their temporary use of the funds. This longstanding arrangement was oral in nature.[3] In this way, Samaniego alleges, he and CSC accrued

---

[2] *See United States v. Salcido*, No. CR09-01878, 2010 WL 2044468, at *3 n.4 (D. Ariz. Mar. 12, 2010) ("In Mexican culture the *padrino* of a child and the child's *father* refer to one another as *compadre*, a sign of respect for each other as benefactors and protectors of the child." (citing *Appleton's New Cuyas English-Spanish and Spanish-English Dictionary* (1972))).

[3] Claimants substantiated the existence and nature of this business relationship through sworn declarations from Samaniego and Salas Alvarez.

a debt of roughly one million dollars to Welton, which required eventual repayment.

After Mexico enacted tighter restrictions on the maximum amounts of U.S. currency that could be deposited in Mexican banks, Samaniego endeavored to help Salas Alvarez transport Welton's excess U.S. currency across the border for deposit in U.S. banks. Samaniego claims he did it as a personal favor for Salas Alvarez, and without compensation, in order to "avoid having [his] *compadre*'s daughter being robbed along the way." To better perform this function, Samaniego enlisted the help of his longtime acquaintance Manuel Castro. Castro was not formally engaged by Welton or CSC, but, from time to time, Samaniego would pay Castro one hundred dollars for his help in making deposits into the two seized accounts.

On May 31, 2011, Samaniego and Castro visited a Chase branch in Arizona to open a personal bank account held in Castro's name. On June 7, 2011, Samaniego also opened a personal Chase bank account under his own name in which both he and Castro deposited excess funds from Welton. Samaniego announced that the purpose of the bank accounts was to "accumulate all the money that [he] owe[d] to Jorge Salas in order to pay him." Castro echoed that the money in the accounts belonged to Welton, and was being set aside to repay a debt to Welton. Collectively, these two bank accounts are the subject of the current forfeiture action.

On August 22, 2011, the government seized the two bank accounts opened by Claimants, based on the belief that the accounts were used in money laundering connected to the illegal drug trade. The government then filed a verified complaint for forfeiture of the two accounts. Claimants responded by filing an answer and verified claims. Following

a round of discovery and briefing, the government moved for summary judgment.[4] The district court granted the government's motion, holding that Claimants had not demonstrated a property interest in the seized funds sufficient to confer standing. Claimants filed a motion for reconsideration. which the district court denied.[5] This timely appeal followed.

## ANALYSIS

### I.  Claimants' Article III Standing

To satisfy constitutional standing requirements under Article III, a claimant contesting the government's civil forfeiture action must show "sufficient interest in the property to create a case or controversy." *United States v. Real Prop. Located at 475 Martin Lane*, 545 F.3d 1134, 1140 (9th Cir. 2008) (quotation marks omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). This showing need only constitute "a colorable interest" in the seized funds, generally through the demonstration of an ownership or possessory interest in the property. *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 637 (9th Cir. 2012) (quotation marks omitted). "[A]n owner or possessor of property that has been seized necessarily suffers an injury that can be redressed at least in part by the return of the

---

[4] As noted earlier, *supra* note 1, the government styled its motion for summary judgment as a "motion to strike" Claimants' answer and verified claims for lack of standing. *See* Fed. R. Civ. P. (G)(8)(C)(ii)(B).

[5] Because we reverse the judgment, we do not dwell on Claimants' challenge to the denial of their motion for reconsideration.

seized property." *Id*. at 638 (quoting *United States v. $515,060.42*, 152 F.3d 491, 497 (6th Cir. 1998)).

The precise "manner and degree of evidence required" to demonstrate standing will vary according to the stage of litigation. *Id.* (quoting *Lujan*, 504 U.S. at 561). A claimant at the summary judgment phase must offer supporting evidence. *Id.* This evidence may take the form of affidavits alleging specific facts, coupled with the claimant's possession of the property when it was seized. *Id.* at 639. Although a claimant need not *prove* standing by a preponderance of the evidence to survive summary judgment, a court must determine that "a fair-minded jury could return a verdict for [the claimant] on the evidence presented." *Liberty Lobby*, 477 U.S. at 252. That is, the evidence set forth must be sufficient for a reasonable factfinder to conclude that the claimant has standing to challenge the forfeiture. *See* Fed. R. Civ. P. G(8)(c)(ii)(B).

## A.  Ownership Interest

A claimant's "unequivocal" assertion of ownership in the seized property, along with physical possession of the property at the time of seizure, can overcome the summary judgment hurdle. *$133,420 in U.S. Currency*, 672 F.3d at 639. However, Claimants' ownership claims have been repeatedly controverted through their own deposition testimony and other record evidence. The district court did not err when it found Claimants' assertions of ownership to be no more than back-pedaling, "late-in-the-day declarations" insufficient to create a genuine dispute as to the ownership of the funds.

At various times, Claimants have asserted conflicting interests in the seized funds. For example, Claimants stated

in their verified claims that the funds "belong[ed] to them."**[6]** During his deposition, however, Samaniego declared that "the money that was seized doesn't belong to us. It belongs to Fruteria and Distribuidora Welton, and we need to pay it back." Castro's deposition testimony confirmed that the funds "belonged" to Welton. When asked why they did not open the accounts in Welton's name, Samaniego responded that "it was our full intention to change the names on both accounts . . . [b]ecause the money belonged to them."

The record reveals other instances when Claimants disavowed legal ownership. In their answers to the forfeiture complaint, Claimants expressly "admit[ted] that Samaniego and Castro transported U.S. dollars belonging to Fruteria Welton or Distribuidora Welton into the United States." Moreover, in the Currency or Monetary Instrument Reports that Samaniego filed with U.S. officials at the border, he represented that he was transporting the currency on behalf of Welton or, at times, CSC.

In a subsequent declaration, Samaniego reasserted his ownership interest in the funds. He claimed that "[b]ecause . . . the Seized Funds were sourced from Welton and would . . . eventually be repaid to Welton, [he] at times referred to them as Welton funds. . . . [S]uch a characterization does not mean—and has never meant—that [he and] CSC lacked an ownership and possessory interest in the funds." To

---

**[6]** Verification, in this context, means that Claimants have submitted sworn pleadings in support of their claims, and specified the property claimed and the nature of their interest in the property. *See* Fed. R. Civ. P. G(5)(a)(i). This procedural requirement serves to protect against the proliferation of false claims in asset-forfeiture proceedings. *See* Stefan D. Casella, *Asset Forfeiture Law in the United States* § 7-13(c), at 313 (2d ed. 2013).

complicate matters, Samaniego, in his declarations, adopted the shorthand of "CSC" to refer collectively to both himself and CSC.

A claimant must "make clear whether he is asserting a possessory interest, an ownership interest, or something else." *Id.* at 640 (quotation marks omitted) (holding that a claimant's bare allegation of "ownership and/or a possessory interest" was lacking specificity and insufficient to survive summary judgment); *cf. Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir. 1991) (discounting a "sham" affidavit when the district court found that it "flatly contradicts earlier testimony in an attempt to 'create' an issue of fact and avoid summary judgment"). In light of Claimants' self-contradictory claims and jumble of shifting legal theories—alternatively alleging ownership on the part of Welton or CSC or Claimants—the district court did not err by holding that Claimants failed to provide indicia of their own ownership of the funds sufficient to defeat summary judgment.

## B.  Possessory Interest

However, Claimants may still demonstrate a possessory interest in the funds that is short of ownership. A possessory interest involves "[t]he fact of having or holding property in one's power; the exercise of dominion over property." *Possession*, Black's Law Dictionary (10th ed. 2014). Unlike an ownership interest, a possessory interest arises even if the claimant is merely "holding the item for a friend" who has temporarily transferred control of the item to the claimant for safekeeping. *United States v. $191,910.00 in U.S. Currency,* 16 F.3d 1051, 1058 (9th Cir. 1994), *superseded by statute on other grounds as stated in United States v. $80,180.00 in U.S.*

*Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002). If the item were seized, the claimant would suffer injury to that possessory interest. *Id.*

In forfeiture proceedings, we have acknowledged that the risk of false claims "requir[es] courts to demand more than conclusory or hearsay allegations of some 'interest' in the forfeited property." *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1118–19 (9th Cir. 2004) (quotation marks and alteration omitted). Neither naked possession nor bare title, standing alone, will do. Rather, a claimant must offer some additional explanation concerning his "lawful possessory interest in the money seized."[7] *$133,420.00 in U.S. Currency*, 672 F.3d at 639 (quoting *United States v. $321,470.00*, 874 F.2d 298, 303 (5th Cir. 1989)). Therefore, at the summary judgment phase, claimants alleging a possessory interest must set forth supporting evidence along with some explanation of how they came into possession of the seized property. *Id.*

---

[7] By "lawful possessory interest," we do not mean that a claimant must prove that his possession is lawful, which is an inquiry better left for the merits stage of an asset-forfeiture action. *See United States v. Hooper*, 229 F.3d 818, 820 n.4 (9th Cir. 2000); *United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 647 (7th Cir. 2015). Instead, a claimant must articulate an interest in the property that is recognized by law. This comports with the principle that, for standing inquiries, the guiding question is whether the claimant would be injured through the seizure of the property, even assuming *arguendo* that the property was wrongfully seized. *See Funds in the Amount of $239,400*, 795 F.3d at 645; *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999); *United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 41 (1st Cir. 2003) ("Courts should not . . . conflate the constitutional standing inquiry with the merits determination that comes later.").

Viewing the evidence in the light most favorable to Claimants, we hold that Claimants' explanation of their respective possessory interests in the seized funds, coupled with supporting evidence in the form of declarations, deposition testimony, bank records, and other evidence, raises a material dispute of fact for trial.

### 1.  Samaniego's Possessory Interest

The district court failed to draw all reasonable inferences in favor of Samaniego when it concluded that only CSC, and not Samaniego, held a property interest in the funds. In this case, it is fair to infer from the evidence that CSC and Samaniego retained a joint interest in the funds. Under this reading, Samaniego has presented sufficient evidence of a possessory interest in the bank account bearing his name to defeat summary judgment.

Here, the relevant evidence primarily took the form of declarations from Samaniego and Salas Alvarez, a part owner and manager of Welton. Samaniego declared that the seized funds were the proceeds of Welton business activities. Samaniego explained that, for nearly two decades, he and CSC had collected Welton proceeds and arranged for their deposit and safekeeping. Salas Alvarez corroborated this explanation of how the seized funds came into Samaniego's possession. Salas Alvarez averred that "[w]hen the armored car companies deliver these proceeds to CSC [and Samaniego], [they] take[] title to, possession, and complete control of the proceeds."

Under these circumstances, a reasonable jury could find that Samaniego has presented adequate evidence, and explanation, of his possessory interest in the funds to confer

Article III standing. Moreover, Samaniego presented further evidence of a "concrete and particularized" injury, *see Lujan*, 504 U.S. at 560, by repeatedly declaring that he was liable for the balance on the accounts. As Salas Alvarez acknowledged, CSC and Samaniego remained "obligated to repay to Welton the amount of these proceeds at a later date."

### 2.  Castro's Possessory Interest

Similarly, we conclude that Castro has set forth sufficient evidence of a possessory interest in the bank account bearing his name to survive summary judgment. Like Samaniego, Castro was the sole individual with signatory authority over the account in his own name. Although he agreed to manage the funds at Samaniego's direction, only Castro was able to access the funds in the account. In addition, Castro was able to identify the source and nature of the funds, explaining they were the proceeds of Welton businesses. Castro presented evidence that the funds came into his possession through an arrangement with Samaniego, whereby Castro assumed safekeeping and control of the funds on Samaniego's behalf. Castro has therefore offered adequate evidence and explanation to distinguish his possessory interest from that of a simple "unknowing custodian," *$191,910.00 in U.S. Currency*, 16 F.3d at 1058 (quotation marks omitted). Accordingly, we conclude he has standing to challenge the forfeiture of the bank account in his name.

## II.  Prudential Standing

In addition to Article III standing, a claimant must satisfy the requirements of prudential standing. *See United States v. Lazarenko*, 476 F.3d 642, 649–50 (9th Cir. 2006). Prudential standing consists of "the general prohibition on a litigant's

raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Id.* (quotation marks omitted). The prudential-standing addendum to the Article III standing inquiry has fallen into disfavor in recent years. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014). To the extent it continues to apply, we conclude that the essential requirements are satisfied here.

First, Claimants do not exclusively "rais[e] another person's legal rights." *Lazarenko*, at 476 F.3d at 649. They are not only the titleholders of the accounts in question, but have articulated colorable possessory interests in the seized accounts in their own right. For similar reasons, neither do Claimants raise "generalized grievances more appropriately addressed in representative branches." *Id*. at 650. Rather, the locus of their injury is the seizure of the accounts. Therefore, the seizure constitutes an injury that is redressable through the return of the property.

Finally, Claimants' challenges "fall[] within the class of plaintiffs whom Congress has authorized to" assert a claim in a civil forfeiture action. *Lexmark*, 134 S. Ct. at 1387. It is precisely those claimants whose property interests are impaired by government seizure that Congress meant to protect through the civil asset-forfeiture laws. *See* 18 U.S.C. § 983(a)(2)(A),(C). As a result, Claimants have provided sufficient evidence of a possessory interest to confer prudential standing.

**CONCLUSION**

We hold that Samaniego and Castro have standing to proceed past summary judgment and challenge the government's forfeiture action. However, we do not address the merits of their claims or preclude the district court from re-examining Article III standing at a later date, in light of additional evidence. Accordingly, we REVERSE the judgment of the district court, and REMAND for further proceedings.