**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RANDEY THOMPSON,

       *Plaintiff - Appellant*,

  v.

CENTRAL VALLEY SCHOOL
DISTRICT NO 365; BEN SMALL,
Individually as Superintendent of the
Central Valley School District;
DEBRA LONG, Central Valley
School District No 365 Board of
Education and in their individual
capacity Board of Education
Members and Directors; MYSTI
RENEAU, Central Valley School
District No 365 Board of Education
and in their individual capacity Board
of Education Members and Directors;
KEITH CLARK, Central Valley
School District No 365 Board of
Education and in their individual
capacity Board of Education
Members and Directors; TOM
DINGUS, Central Valley School
District No 365 Board of Education
and in their individual capacity Board
of Education Members and Directors;

No. 24-5263

D.C. No.
2:21-cv-00252-
SAB

OPINION

CYNTHIA MCMULLEN, Central
Valley School District No 365 Board
of Education and in their individual
capacity Board of Education
Members and Directors,

*Defendants - Appellees*.

Appeal from the United States District Court
for the Eastern District of Washington
Stanley Allen Bastian, District Judge, Presiding

Argued and Submitted September 17, 2025
Seattle, Washington

Filed December 29, 2025

Before: William A. Fletcher, Ronald M. Gould, and Ana de
Alba, Circuit Judges.

Opinion by Judge Gould

## SUMMARY[*]

### First Amendment/Retaliation

The panel affirmed the district court's summary
judgment for the Central Valley School District ("CVSD")

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

and individual school administrators in a suit brought by Randy Thompson, a former middle school assistant principal, alleging retaliation in violation of the First Amendment.

Thompson was placed on paid administrative leave and subsequently transferred to a teaching position as a result of his posting on Facebook a comment about the Democratic National Convention that used epithets, slurs, and violent language.

Applying the two-step *Pickering* framework, the panel affirmed the district court's conclusion that Thompson made out a *prima facie* First Amendment retaliation claim for private speech he made on a matter of public concern. The panel assumed, without deciding, that a reasonable jury could conclude that placing Thompson on paid administrative leave could constitute an adverse employment action and that the record supported a finding that the Facebook post was a substantial or motivating factor in that decision. However, CVSD sufficiently showed a reasonable prediction of disruption under *Pickering* Step Two. CVSD's interest in creating a safe and inclusive school environment outweighed the public interest commentary contained in Thompson's speech.

Because Thompson's First Amendment rights were not violated, the panel affirmed the district court's finding of qualified immunity in favor of the individual school officials.

**COUNSEL**

Michael B. Love (argued), Riverside NW Law Group, Spokane, Washington; Robert F. Greer, Megan C. Clark, and Samir Dizdarevic-Miller, Etter McMahon Lamberson Van Wert & Oreskovich PC, Spokane, Washington; for Plaintiff-Appellant.

Michael E. McFarland Jr. (argued), Rachel K. Stanley, and Christopher J. Kerley, Evans Craven & Lackie PS, Spokane, Washington, for Defendants-Appellees.

**OPINION**

GOULD, Circuit Judge:

Randey Thompson, a former assistant principal for Evergreen Middle School in the Central Valley School District ("CVSD"), brought suit for retaliation in violation of the First Amendment after he was placed on paid administrative leave and subsequently transferred to a teaching position as a result of his posting on Facebook a comment about the Democratic National Convention that used epithets, slurs, and violent language.

The district court granted summary judgment in favor of the CVSD and the individual school administrators, concluding that Thompson had made a *prima facie* claim for retaliation, but that the CVSD met its burden of showing that its interests outweighed Thompson's interests in his post. The district court also concluded that qualified immunity applied to the individual school administrators. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A

In August 2020, Randey Thompson was an assistant principal at Evergreen Middle School in the CVSD. After watching the Democratic National Convention, Thompson made a post on his Facebook page. Thompson contends that the post made on his private Facebook page shared his personal comments and opinions only with his "friends" on Facebook. The post stated verbatim (including its typographical errors):

> Demtard convention opens and the only facts spoken were the names. Lie after lie. The fact checkers could retire on Michelle Obama's rant alone. What s hatefull racists bitch. If you need to lie to try and win you are just shit. If you believe them you are even worse. Wake the fuck up America. You are being played by a fake media, athleats and performers (who are really clueless and flyers with pedophile man) and the former DNC, now just the little bitch of Marxist BLM, Antifa, and Soroas socialist. You are missing out on a great country and the rest of us are sick and tired of your act and going to take you to the woodshed for a proper education. May God help you to pull your heads out of your asses so we will not have too. Time for the red tide. Lets see how long until the FB liberal defenders take this one down.

While scrolling through Facebook, a CVSD employee saw the post on her newsfeed. She took a screenshot of the

post and sent it to her sister, another CVSD employee. The sister forwarded the screenshot to a CVSD administrator, who shared the post with another CVSD administrator, who in turn brought the post to the attention of CVSD Superintendent Ben Small.

Two days after the post was made, on August 19, 2020, Thompson received a phone call from then-Assistant Superintendent Jay Rowell. Rowell asked Thompson if he had made a Facebook post about the Democratic National Convention. Thompson confirmed that he had and told Rowell it was a political post on his private Facebook account and had been sent only to friends and relatives who shared his political beliefs. Thompson emphasized that the post was made on his own time and on his personal device. Rowell then informed Thompson that he was being placed on paid administrative leave effective immediately. Thompson was not allowed on CVSD property, nor was he allowed to contact CVSD employees, teachers, parents, and students. Immediately after this conversation, Thompson deleted the Facebook post.

On the next day, August 20, 2020, the CVSD retained attorney Amy Allen to conduct an independent investigation into the Facebook post. Allen interviewed the employees who had seen the post. Those employees expressed concern about the post because they thought it used hateful language. The employees specifically noted the use of the term "demtard" was highly offensive and potentially harmful to students, families, and community members.

Allen then interviewed CVSD administrators to determine whether this was a unique occurrence or part of a pattern of behavior. One administrator told Allen that, in a presentation to staff, Thompson had referred to current

students as "Tide Pod Challenge Kids" and "snowflakes." Another administrator told Allen that Thompson used the word "short bus" when referring to students enrolled in special education classes. A third administrator told Allen that Thompson, while speaking to a focus group of ten students who self-identified as African-American, asked a Black student if he felt that teachers had treated him differently than "normal" students.

On August 22, 2020, Thompson received a letter from the CVSD dated August 20, 2020, reiterating that he was being placed on administrative leave because of unprofessional conduct and that, while on leave, he was prohibited from having written or verbal contact with students.

In September 2020, Rowell conducted "impact interviews" of a sample of Board Members, in-district administrators, in-district teachers, and parents of current CVSD students to determine the potential impact of Thompson's Facebook post and the incidents reported to Allen by CVSD administrators. Rowell concluded that the interviewees were shocked and concerned about the statements, and many of those interviewed found the Facebook post and the other comments made by Thompson during school insensitive and detrimental to Thompson's relationship with staff, students, and CVSD community members.

On September 22, 2020, the school Board held a "notice-and-opportunity meeting" to provide Thompson with the opportunity to address the allegations against him, which included his Facebook post and the derogatory comments he made at school that were discovered during the investigation.

In the meeting, Thompson initially said that his Facebook was "hacked" and that a hacker made the post.[1] The CVSD retained a forensic investigator who found no evidence of unauthorized use of Thompson's Facebook account, noted that Thompson was reluctant to provide his electronic devices, and reported that Thompson provided only an incomplete history of his Facebook data. Based on the forensic investigator's report, Rowell concluded that Thompson was not being truthful.

On January 21, 2021, the CVSD offered Thompson a voluntary transfer to a teaching position if he signed a release of claims. The agreement said that if Thompson signed the release, the CVSD would end its investigation and would not terminate him. Rowell told Thompson and his union representative that the transfer agreement was proposed in part to avoid formally alleging that Thompson lied about his Facebook account being hacked. Thompson rejected the transfer offer.

A second notice-and-opportunity meeting was held on May 6, 2021, to address two new allegations against Thompson. The first new allegation was that Thompson interfered with the CVSD's investigation by deleting his emails and refusing to transfer his data to the forensic examiner. The second new allegation was that Thompson was dishonest when he claimed his Facebook was hacked. At that hearing, Thompson claimed that he deleted his personal emails as a regular practice but kept anything

---

[1] Thompson claimed that he had a slightly differently worded version of the post that he intended to put on his Facebook. While there were minor spelling and word changes in the version Thompson says he intended to post, the word "demtard" and language about taking individuals "to the woodshed for a proper education" were present in both posts.

related to this investigation; that he was reluctant to give the forensic investigator information for his own privacy and to protect his friends; and that he wiped and sold his old devices and could not provide them. He asserted that he had been hacked but admitted that he had no evidence of the alleged hack.

On May 10, 2021, Superintendent Small sent a Notice of Transfer to a Subordinate Position via certified and regular mail to Thompson. The letter identified seven reasons for the transfer: (1) Thompson's behavior as an administrator had disrupted harmony among building staff and CVSD representatives, to the point that returning him to his prior position supported a reasonable prediction of disruption; (2) his comments were insensitive and contrary to the CVSD's mission of creating an inclusive culture, causing concerns about Thompson's ability to be an administrator promoting the CVSD's best interests; (3) Thompson's behavior, including his lack of inclusiveness, caused decreased confidence of administrators and caused concerns about his willingness to promote and embrace the CVSD's interest in an inclusive learning and working environment; (4) Thompson's behavior interfered with his ability to do his job, especially as a student disciplinarian and staff evaluator; (5) the CVSD believed that Thompson interfered with a CVSD investigation about his behavior and he was not truthful during the investigation; (6) Thompson's response to the CVSD's concerns about his behavior demonstrated a lack of awareness and insight needed for a school administrator; and (7) in balancing the totality of circumstances, the best interests of the CVSD would be served by transferring Thompson from an administrative position to a non-administrative certificated teaching position.

Thompson asked for another hearing with the school Board, and that hearing was held on June 14, 2021. *See* Wash. Rev. Code § 28A.405.230. On June 25, 2021, Thompson received a letter saying that the Board upheld the Superintendent's decision to transfer him to a certified teaching position.

## B

Thompson sued the CVSD and several individual school administrators on August 23, 2021, pursuant to 42 U.S.C. § 1983, alleging in part that his First Amendment rights had been violated. On January 12, 2022, the individual administrators moved for summary judgment on the sole question of qualified immunity. On February 24, 2022, the district court denied the motion, concluding that there were genuine questions of material fact. On interlocutory appeal, we affirmed the denial of summary judgment. *See Thompson v. Small*, No. 22-35192, 2023 WL 3580744, at \*1 (9th Cir. May 22, 2023).

After discovery, the parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of the CVSD. It concluded that although Thompson made out a *prima facie* First Amendment retaliation claim, the CVSD met its burden under *Pickering*. The court determined that the CVSD's interests in fostering a safe and inclusive school environment outweighed Thompson's First Amendment interests, and that the CVSD would have transferred Thompson absent his Facebook post. The district court also found that the individual school administrators were entitled to qualified immunity. Thompson timely appealed.

## II.  STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment and its determinations of qualified immunity. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013); *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021).  "Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine dispute as to any material facts."  *United States v. JP Morgan Chase Bank Account No. Ending 8215*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quotation marks omitted).

## III.  DISCUSSION

We review a public employee's First Amendment retaliation claim against their government employer under the two-step *Pickering* framework.  *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). At Step One, the plaintiff must show that (1) he spoke on a matter of public concern, (2) he suffered an adverse employment action, and (3) his protected expression was a substantial or motivating factor for the adverse action. *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 721 (9th Cir. 2022).  If the plaintiff satisfies Step One, he has established a *prima facie* claim for First Amendment retaliation.  The burden then shifts to the public employer at *Pickering* Step Two to demonstrate either: (1) that its legitimate administrative interests in promoting an efficient workplace and avoiding workplace disruption outweigh the plaintiff's First Amendment interests; or (2) alternatively, the government would have taken the same actions absent plaintiff's expressive conduct.  *Id.*

**A**

First, we affirm the district court's conclusion that Thompson made a *prima facie* claim of retaliation for private speech he made on a matter of public concern. "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). To determine whether the speech in question was on "a matter of public concern," we consider the "content, form and context of a given statement, as revealed by the whole record." *Id.* (quoting *Connick*, 461 U.S. at 147–48).

Thompson's Facebook post was made on his private Facebook account and criticized the Democratic National Convention. It was private speech on a matter of public concern. We are not persuaded by the CVSD's arguments that Thompson's use of slurs or violent language in the Facebook post took the political post outside the realm of public concern.[2] *See Rankin v. McPherson*, 483 U.S. 378, 387 (1987) ("[T]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern.").

Second, we assume, without deciding, that a reasonable jury could conclude that placing Thompson on paid administrative leave could constitute an adverse

---

[2] Because we hold that Thompson's speech was private speech on a matter of public concern sufficient to establish a *prima facie* claim, we do not reach Thompson's arguments that the CVSD conceded these *Pickering* elements or that the doctrines of judicial admission or waiver should apply. *See Thompson v. Small*, No. 22-35192, 2023 WL 3580744, at *1 (9th Cir. May 22, 2023).

employment action given that Thompson was cut off from CVSD property and contact with other CVSD staff, and therefore may have suffered "general stigma." *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1078–79 (9th Cir. 2013) ("[U]nder some circumstances, placement on administrative leave can constitute an adverse employment action.").

Third, the record supports that the Facebook post was a substantial or motivating factor in placing Thompson on administrative leave. The CVSD placed Thompson on administrative leave within only a few days after discovering the Facebook post, and the individual administrators' testimony confirmed that Thompson's Facebook post was the catalyst to opening the investigation of Thompson's practices and conduct when he taught at the school. The temporal proximity between the speech and the placement on administrative leave supports Thompson's *prima facie* claim for retaliation. *See Anthoine v. N. Cent. Cntys. Consortium*, 605 F.3d 740, 750 (9th Cir. 2010) (evidence that an action was a substantial or motivating factor in an adverse employment action can be found from the fact that the speech and the action were proximate in time, or that the employer expressed opposition to the speech). Furthermore, that the CVSD admitted the Facebook post's language— including Thompson's use of the word "demtard"—was the sole reason for Thompson's placement on administrative leave supports Thompson's *prima facie* claim for retaliation.

## B

We nonetheless affirm the district court's grant of summary judgment in favor of the CVSD because the CVSD met its burden under *Pickering* Step Two. The CVSD was justified in putting Thompson on paid administrative leave because of its reasonable prediction of disruption, and the

record supports that the CVSD showed its interests in ensuring its administrators foster a safe and inclusive educational environment outweigh Thompson's First Amendment interests. Therefore, Thompson's claim fails.

The *Pickering* balancing test "recognizes that a government employer has 'broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.'" *Moser v. L.V. Metro. Police Dep't*, 984 F.3d 900, 906 (9th Cir. 2021). When we balance competing interests, we use a "sliding scale" in which the state's burden to justify a particular discharge or adverse employment action "varies depending upon the nature of the employee's expression." *Id.* at 905– 06 (quoting *Connick*, 461 U.S. at 150); *see also Hyland v. Wonder*, 972 F.2d 1129, 1139 (9th Cir. 1992) (holding that the government's burden to show disruption "varies with the content of the speech"). The *Pickering* balancing inquiry ultimately poses a question of law. *Moser*, 984 F.3d at 905.

### 1. Thompson's First Amendment Interests

We have recognized that although speech about matters of public concern "occupies the highest rung of the hierarchy of First Amendment values," *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 782 (9th Cir. 2022) (quotation marks omitted), "not all statements of 'public concern' are treated equally under the *Pickering* balancing test," *Moser*, 984 F.3d at 905. That speech touches upon an issue of "public concern" at Step One of the *Pickering* balancing test does not end our "inquiry into the content of [the] speech" for purposes of determining "how much weight to give the government employee's First Amendment interests" at Step

Two.  *Moser*, 984 F.3d at 906; *see also Damiano v. Grants Pass Sch. Dist. No. 7*, 140 F.4th 1117, 1140 (9th Cir. 2025).

The "apex" of First Amendment protection is reserved for political speech that addresses problems at the government agency where the employee works.  *Moser*, 984 F.3d at 906; *Damiano*, 140 F.4th at 1140.  But we have also recognized that the protection afforded to government employee's speech may be lessened where the speech is derogatory in nature.  For instance, we have previously suggested in dicta that "racially charged comments that have no connection to the government employee's workplace arguably receive less First Amendment protection under the *Pickering* balancing test[.]"  *Id.* at 906 (citing *Grutzmacher v. Howard Cnty.*, 851 F.3d 332 (4th Cir. 2017)).  In *Moser*, we cited a Fourth Circuit case, *Grutzmacher v. Howard Cnty.*, for the proposition that derogatory speech that touches on a matter of public concern as a whole, but is unrelated to an individual's workplace or expertise, might be entitled to less weight under Step Two of the *Pickering* balancing test.  But we did not decide precisely how the use of derogatory language in such speech would affect the *Pickering* Step Two analysis because the plaintiff's use of a derogatory term was not at issue.  *Moser*, 984 F.3d at 903 n.1; *see also Hernandez v. City of Phoenix*, 43 F.4th 966, 978–79 (9th Cir. 2022) ("Speech that expresses hostility toward racial or religious minorities *may be* of particularly low First Amendment value at [Step Two] of the *Pickering* balancing test . . . , but its distasteful character alone does not strip it of all First Amendment protection." (emphasis added)).  Because the derogatory speech is at issue here, we do so now.

*Grutzmacher* is instructive.  In *Grutzmacher*, the Fourth Circuit held that at least some of a county fire department

employee's string of Facebook posts, comments, and "likes" were on a matter of public concern because the posts as a whole addressed gun control.  851 F.3d at 342–43.  At issue there, as here, was that some comments that the plaintiff "liked" or used on Facebook were derogatory, racially-charged or violent.  *Id.* at 337–38.  The *Grutzmacher* court held that the *Pickering* balancing test favored the county at Step Two because the plaintiff's Facebook activity was "not of the same ilk" as cases where a government official's speech was "grounded . . . in specialized knowledge," and that the county's interest in efficiency and preventing disruption "outweighed the public interest commentary contained in [p]laintiff's Facebook activity."  *Id.* at 347–48.  We similarly reasoned in *Hernandez v. City of Phoenix*, without deciding, that an employee's speech was of "comparatively low value" under *Pickering* Step Two when the employee's speech addressed a matter of public concern, but did so in a way expressing racial and religious hostility.  43 F.4th at 979.

As in *Grutzmacher* and *Hernandez*, Thompson's Facebook post was not grounded in specialized knowledge, nor based on insight he had gained into the school system while acting as an assistant principal.  *See Damiano*, 140 F.4th at 1140 ("[W]e have long recognized 'the importance of allowing teachers to speak out on school matters,' . . . because '[t]eachers are, as a class, the members of a community most likely to have informed and definite opinions' on such matters." (quoting *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 514 (9th Cir. 2004))).  Although Thompson's post, read broadly, touched on a matter of public concern, Thompson's use of disability-related slurs like "demtard" and his use of violent language suggesting taking individuals "to the woodshed for a proper education"

are not speech entitled to the highest constitutional protection. *See Hernandez*, 43 F.4th at 979 (remarking that speech that expresses hostility toward racial or religious minorities may receive less protection under *Pickering*); *Grutzmacher*, 851 F.3d at 345 (finding that a government employer's interest in efficiency and preventing disruption outweighed the plaintiff's interest in speaking in a violent manner regarding gun control). Stated another way, the "demtard" slur was not comparable in speech value to comments of teachers that are based on knowledge they gained as educators. For these reasons, we give Thompson's interest in his Facebook post speech little weight under *Pickering* Step Two.

## 2.   The CVSD's Interests

For "the government's interest as an employer in a smoothly-running office" to outweigh "an employee's [F]irst [A]mendment right[s], [the government] must demonstrate actual, material and substantial disruption, or reasonable predictions of disruption in the workplace." *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (cleaned up). We have determined that the extent of disruption the CVSD must show under *Pickering* Step Two is based on a "sliding scale" when balanced against the weight we give Thompson's First Amendment interests. *Moser*, 984 F.3d at 905. Because we hold here that Thompson's First Amendment interests are not entitled to the "apex" of First Amendment protection, the CVSD need not show as much potential disruption to prevail. The CVSD cannot rely on "mere speculation" or "bare assertions of future conflict" at the summary judgment stage. *See Nichols v. Dancer*, 657 F.3d 929, 933–34 (9th Cir. 2011). Instead, the CVSD must provide evidence sufficient for us to evaluate fully and fairly whether claims or predictions of disruption are reasonable. *Id.*; *see also Craig*

*v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013) ("[A]n employer's assessment of the possible interference caused by the speech must be reasonable—the predictions must be supported with an evidentiary foundation and be more than mere speculation." (quotation marks and citation omitted)).

The Supreme Court has told us that several factors are relevant to assessing the impact of a public employee's speech on a public employer's operations, including:

> whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

*Rankin*, 483 U.S. at 388.

These factors weigh in favor of the CVSD. The CVSD reasonably predicted that a Facebook post by a school administrator using disability-related slurs and violent language was likely to disrupt CVSD operations. The predictable disruption was intensified and reinforced by Thompson engaging in speech while serving in a public-facing role as an assistant principal that undermined the CVSD's written resolution to foster a safe and supportive educational environment. As an employee of the CVSD, Thompson had a responsibility to uphold the district's formal commitment to equity and inclusion. As evidenced by his Facebook post and workplace comments, Thompson did not uphold his commitment, and we accordingly find that

Thompson's derogatory and violent language could substantially disrupt the orderly operation of the school.

Interviewees' statements about Thompson confirmed the CVSD's earlier prediction that the Facebook post was reasonably likely to disrupt school operations. Specifically, other CVSD administrators expressed concern about their ability to work with Thompson based on his language in the Facebook post, and questioned his ability to be in a leadership position. Many interviewees expressed that the disability-related slur and violent language did not reflect the CVSD's core values, negatively portrayed the CVSD, and ran counter to the CVSD's Resolution Recommitting to Equity and Inclusion. Additionally, interviewees confirmed that they believed Thompson's ability to discipline students would be impacted if students learned of the Facebook post. Ultimately, interviewees questioned Thompson's ability to work effectively with students and parents, or to act as a representative of the school. As such, Thompson's statements can be fairly viewed as creating disharmony among co-workers and detrimentally impacting his close working relationships requiring loyalty and confidence.

Finally, Thompson's position in a public-facing, supervisory role as an assistant principal is relevant in assessing likely disruption. The "extent of an employee's authority and interactions with the public also bears on the degree of government interest in preventing disruption." *Rankin*, 483 U.S. at 392. The government's interest in "avoiding disruption is magnified when the employee asserting [a First Amendment] right serves in a 'confidential, policymaking, or public contact role.'" *Moran v. State of Washington*, 147 F.3d 839, 846 (9th Cir. 1998) (quoting *Rankin*, 483 U.S. at 390–91). And, we have recognized that public school employment "is precisely the type of

employment relationship" to which "a wide degree of deference to the employer's judgment is appropriate." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 981 (9th Cir. 1998) (quoting *Connick*, 461 U.S. at 151–52).

The CVSD contended and put forth evidence that Thompson worked in a supervisory and disciplinary role, and that his comments and language conflict with the CVSD's resolution recommitting the CVSD to equity and inclusion and to "fostering an equitable school culture." Moreover, interviewees raised the specific concern that Thompson engaged in speech inconsistent with the CVSD's values while he served as a representative of the school leadership. Recognizing the "wide degree of deference" we afford the CVSD's judgment when making employment decisions, this evidence sufficiently shows that the CVSD's prediction of disruption from the Facebook post was reasonable and not based on "rank speculation or bald allegation." *Damiano*, 140 F.4th at 1138; *see also Nichols v. Dancer*, 657 F.3d 929, 933–34 (9th Cir. 2011) (holding that "mere speculation" and "bare assertions of future conflict" are insufficient for summary judgment under *Pickering* Step Two); *Brewster*, 149 F.3d at 981.

We hold that the CVSD sufficiently showed a reasonable prediction of disruption under *Pickering* Step Two. Because we give Thompson's speech little weight under the *Pickering* balancing test, we hold that the CVSD's interest in creating a safe and inclusive school environment outweighs the public interest commentary contained in Thompson's speech. In so holding, we caution that the *Pickering* balancing test is a "particularized balancing on the unique facts presented in each case," and we do not suggest that every time employee speech contains slurs or violent

language, the government interest will automatically prevail at *Pickering* Step Two. *See Brewster*, 149 F.3d at 980 (quoting *Voigt v. Savell*, 70 F.3d 1552, 1560–61 (9th Cir. 1995)). Each case should be examined in its unique context, considering the totality of circumstances. We must strive to reach "the most appropriate possible balance of competing interests." *Connick*, 461 U.S. at 150. In this case, we are particularly mindful of the extreme import of ensuring the maintenance of a safe and supportive school environment where children have a chance to reach their full potential.

Because we conclude that the CVSD met its burden to show that its interests outweigh Thompson's First Amendment interests, we decline to reach the alternative ground as to whether the CVSD would have taken the same actions absent Thompson's expressive conduct. *Riley's*, 32 F.4th at 721. We therefore affirm that the CVSD correctly met its burden under *Pickering* Step Two.

## C

Because we hold that Thompson's First Amendment rights were not violated, we affirm the district court's finding of qualified immunity in favor of the individual school officials. *See Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) ("Qualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." (internal citations and quotation marks omitted)).

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the CVSD and affirm

the district court's grant of qualified immunity to the individual school administrators.

**AFFIRMED.**